UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMIBA

IN THE MATTER OF THE SEARCH OF        )
ITEM DESCRIBED IN ATTACHMENT A        )    Mag. No.
                                      )
LOCATED AT:                           )
                                      )
FBI WASHINGTON FIELD OFFICE           )
601 4TH STREET NW                     )
WASHINGTON, D.C. 20535                )

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Laura R. Calvillo, Special Agent of the Federal Bureau of Investigation (FBI), Washington, D.C., Field Office, Northern Virginia Resident Agency, being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.   I am a Special Agent with the Federal Bureau of Investigation and have been since March of 2016. I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency. Prior to joining the FBI, I was a Special Agent for the U.S. Army Criminal Investigation Division, and assigned to investigate violations of federal law to include violations involving child pornography and the sexual exploitation of children. Currently, as an FBI Special

1

Agent, I investigate federal violations concerning kidnapping, child pornography, the sexual exploitation of children, human trafficking, and related offenses.

3. As a federal agent, I am authorized to investigate violations of United States laws and to execute search warrants issued under the authority of the United States. I have gained experience in such investigations through formal training and on-the-job training with more experienced agents. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers.

4. The information in this Affidavit is based on my investigation, training, knowledge, and experience, and through information that has been related to me through data, reports and other officers or agents involved in this investigation and related subject area. Because this affidavit is being made for the limited purpose of securing a search warrant, I have not included each and every fact known to Your Affiant.

   a. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the following statutory provisions have occurred: Title 18, United States Code Sections 2252 (Activities Relating to Material Involving the Sexual Exploitation of Children), and 2252A (Activities Relating to Material constituting or Containing Child Pornography). I have reason to believe that the electronic device will have stored information and communications that are relevant to this investigation. Thus, as outlined below, and based on my training and experience, there is probable cause to search the information described in Attachment A for evidence, fruits and/or instrumentalities of these crimes further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.  The property to be searched is a gold and white Apple iPhone 6S model A1688, hereinafter the "Device." The Device is currently located at the FBI Washington Field Office, 601 4th Street, Washington, D.C. 20535.

6.  The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.  Leading up to Tuesday, January 2, 2018, a detective with the Metropolitan Police Department ("UC") was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force operating out of a local office in Washington, D.C. Prior to that date, the UC had posted numerous online bulletin messages on specific social media forums, which, based on the UC's experience and information gathered from other sources, are websites that are frequented by individuals who have a sexual interest in children and incest. The bulletin messages were intended to attract individuals with a sexual interest in children. Your affiant would respond to certain messages or post messages on these public forums and provided his "KIK" account screen name.[1]

8.  On Tuesday, January 2, 2018, at approximately 6:32 a.m. EST, an individual using the KIK screen name, "eagle8310," subsequently identified as the defendant, Jordan Adler, sent the UC a private message via KIK instant messenger stating, "Hey there, Im in DC into little ones too."[2] During the course of the chat, the defendant stated that he was a 20-year-old college student

---

[1] "KIK" refers to KIK messenger, a free mobile application that permits users to send text messages and other content, including videos and images.
[2] All text abbreviations and typographical errors included in quoted text language are original.

3

residing in Adams Morgan, Washington, D.C. The following is a portion of the initial KIK exchange between the defendant and UC:

Defendant: Hey there, Im in DC into little ones too

UC: Hey dad here with little girl. You?  Im in DC too moved here from VA after divorce.

Defendant: Nice, that means your close. Any chance you'd be willing to let me play with her with you there?

UC: Maybe. Need to build some trust. She is 8 not sure if that is too young or not.

Defendant: That's the perfect age for me. And I understand. Im a college student here.

UC: Ok cool I live in NW where the caps and wizards play. You?

Defendant: I live in NW too, near AdMO. Very close by ☺

UC: ☺ What is your schedule like? I have shared custody. Are you sure your real and not a cop or trap?

Defendant: Free most days, especially if you have her the next few days or weekends. I can come over whenever. I promise I'm not haha.

UC: Ok Cool. I will have her tomorrow unless my ex acts like a bitch in will know by tomorrow mid morning. U have any exp at all. What are u looking to do Im not fully active with her.

Defendant: Sounds good. And Ill be slow and gentle at first, looking to maybe play with her pussy, touch her tits, maybe put some of my cock inside her.

UC: Ok Im good with all that. How do I know yours safe?  Like as in cool

Defendant: I promise you I am. I wanted to play with a girl for a long time.

UC: Just don't want to get in trouble. U have any experience at all with young?

Defendant: You'll see me tmrw and know Im real. Yes I do my little cousin.

UC: Mmmmm what does she look like?

Defendant: She is a cute little blond. ☺ No pic of her on my phone sadly. Got s pic of your girl?

UC: Yes. What kind of pics u have?

Defendant: Very young dB[3] links

UC: Mmmmm. Nice love very very yng ☺. What's the best link u have?

Defendant:   Involves toddlers ;)

9.      The defendant then sent the UC via KIK messenger to the UC's cellular phone a video file that is two minutes in length.  The video depicts a toddler girl that appears to be approximately two years of age being vaginally penetrated by an adult male penis.  The toddler is crying and screaming throughout the video as she is being sexually assaulted by the adult male.  The KIK chat then continued as follows:

UC: Mmmmmm fuck yeah. Love that

Defendant: Can I see her now?

UC: Yes

Defendant: And you'd be there watching right?

UC: Yes. Love the vid so hot !

10.     The UC sent the defendant two images of his purported daughter, one exposing her abdomen and chest and one depicting the purported child wearing a pink shirt, with a note containing the date next to her.  The images did not depict a real child. The chat then continued as follows:

UC: Just so u know Im real. Took that this morning before school.

---

[3] Based on training and experience, the UC understood "dB" to refer to the cloud storage application, Dropbox.  Dropbox allows users to create a storage account and to upload and manage content that can be shared via link and a password specific to the user's Dropbox account.

Defendant: Mmmmm I bet you can't wait for me to slip my cock inside of her.

UC: Mmmm yes can't wait

Defendant: Will you join me in fucking her?

UC: Yes for sure! Cant wait to see her with another cock. How old is cousin?

Defendant: A thick college cock. ;) She is 8 too! So I know her age pussy well....I've cum insider her actually when asleep.

11. The defendant and the UC continued to chat via KIK messenger about the logistics of a meeting, during the course of which the defendant and the UC arranged to meet at a bar in Washington D.C. near the UC's purported home. During the course of the discussion, the defendant asked, "Could I see your cock next to her maybe?" to which the UC responded, "I don't have any like that but like a said once I know your real and cool with it Ill face time and have her finger herself before we walk up. Is that cool? Im 33 you?" The defendant indicated, "I'm 20. That works Just don't want to be busted lol." The defendant continued pressing for an image as follows:

Defendant: Pussy pic?

UC: Looking forward to it. Let me look I don't think so I try to be careful with that. What else you have?

Defendant: Trust me I'm a college boy looking for young girls you have nothing to fear. I have many links.

UC: … [sends an image of his purported child lying facedown on a bed. The image did not depict a real child]…

Defendant: … Any of her pussy tho.

12. After further discussion, the defendant stated that he would "bring a few" videos of child pornography with him to the meeting with the UC. Later that afternoon, the KIK chat resumed:

Defendant: Sounds good. Would you let me cum inside he. Her

UC: Yes so long you are DDF.

Defendant: Of course, completely clean.

UC: Ok cool no worries. If your taking Metro the closest to me is gallery place.

Defendant: Ok perfect. Does her pussy get wet?

UC: Yes but not fully.

Defendant: That's okay. I'll make sure to bring some lube.

UC: Cool.

Defendant: I can't wait to play with her little tits too. Is her clit sensitive yet?

13. After indicating he was "so excited to fuck her," the defendant resumed discussing logistics of a meeting with the UC.

14. On January 3, 2018, the defendant re-initiated contact with the UC via KIK instant Messenger. The following is a portion of that chat:

Defendant: Hey can I see a face pic of yours? Just so I know who you are when we meet. If we could FT[4] and you show me her pussy and your face that would be amazing. I'm really looking forward to seeding your daughter.

UC: Hey. Im looking forward to today!

Defendant: Same here! Im gonna fuck that pussy so good, so deep. Her cherry popped?

UC: Yes but tight as hell

Defendant: Any chance you can Face Time beforehand and you can show me yourself with her? Nervous about getting caught naturally. But I want that pussy so badly. I wanna fuck her and seed her with my warm cum.

UC: Me to I have the most to lose here lol.

---

[4] The UC understood, based on his training and experience, that "FT" referred to the application "FaceTime," which allows users to video conference via cellular telephone.

Defendant: That's true haha

UC:  Big risk for me that's why I want to be careful, got nervous when u said u wanted to see face but I understand.  Maybe we can do a live pic, can u hold up 2 fingers in front of face and I'll hold up what u tell me to.

Defendant: I sent you violent Yung vid I think you're fine. ;)

15.     Subsequently, UC and defendant exchanged images of themselves. The defendant requested that the UC send a picture of himself making a, "rock and roll sign," with which the UC complied.  The UC requested that defendant send an image of himself holding up two fingers in front of his face. The defendant complied and sent and image of himself holding up two fingers exposing half of his face. The defendant also sent an image of his penis.  The defendant stated, "this thick meat wants her so bad."  The defendant continued asking the UC questions about his purported daughter, including whether the defendant's "cock" is "good for her?" and the size of the UC's penis.  The defendant stated that he would be arriving to the prearranged met location via Metro.  The chat continued as follows:

Defendant: Nice man. So horny for this to happen. If you could send a pussy pic after she gets home I'd love that.

UC:  That won't be till we meet so I know for sure your serious.  I may have some of her in my gallery though.  Can u bring your other good porn with very yng, so we can put it on for her?  I think that is a fair de3al since I'm letting u okay with her.

Defendant:  That'd be great. And yes I will. I'll bring a lot. If you have some in the gallery that'd be ideal.

UC: Ok cool.

Defendant:  Does she have any limits?

UC:  Just no fucking her in ass finger is ok though

Defendant:  Does she suck good cock?

UC:  Oh yeah.

8

Defendant: I'm hard just thinking about her.

…

16.     The defendant then asked the UC if he had any pictures of his daughter's "pretty little pussy?" The defendant commented that the UC's purported daughter has a "tight body, can't wait to slip it in and seed her." After further discussing the child, the defendant stated, "I may have to fuck her multiple times… Make this a regular thing." During the course of the chat the defendant stated that he would bring his collection of child pornography with him to the meet. Initially the defendant stated that he would bring his child pornography on a thumbdrive, but later stated that he would send the links to the UC once he arrived, stating that he wanted to, "play it safe." The defendant stated that "some of the shit I have is pretty brutal. ☺" The UC responded, "Mmmmmm I REALLY love that, so bring it but we can go slow with her with some tame kiddy stuff" to which the defendant stated, "Eventually wanna introduce some pervy brutal stuff. ☺"

17.     After further discussion about the defendant's planned sex acts and the logistics of the meet, the chat continued as follows:

> Defendant: …I hope she's ready to fuck today. I'm so horny I'm gonna cum loads inside her pussy.
>
> UC: Yes she will be, I think I have some lube at house but it may be wise to bring some. And don't forget the porn, I wanna have that on while u play with her.
>
> Defendant: Ill start slow but Im going fuck her hard as fuck. Really getting deep in that young cunt. Thank you for letting me use your daughter as my cum dump.
>
> UC: Yes no problem.
>
> Defendant: I hope she can take it all. Are you gonna cum in her too?
>
> UC: Yes for sure Ill let you go first.
>
> Defendant: I'm pretty nervous. Hope this isnt a sting.

UC: Im nervous as fuck… couldn't hardly eat.

Defendant: It'd help a lot if I can see you with her pussy, that way I know for sure. But I get the Face Time thing. And I want her so badly.

UC: Yeah I feel comfortable with the Face Time.

Defendant: Maybe before we even meet you can Facetime me with her and show her pussy? Just to make sure.

18.     Later that afternoon, after further discussion about the terms of their meeting and their nervousness about not getting caught, the defendant indicated he was close to the planned meeting point, stating:

Defendant: 15 minutes away.

UC: Oh cool

Defendant: Yeah very close by

UC: Sweet

Defendant: I really can't wait Im so excited for her!! And you get her everyday.  Lucky

UC: Not everyday but a lot lol

Defendant: She needs to see this violent porn.

UC: Mmmmmmmmmm.  Fuck yeah.  I have a dell laptop, is your thumb drive close compatible.

19.     The defendant and the UC continued to discuss via KIK messenger the logistics of the defendant providing additional child pornography to the UC.  The defendant also stated, "She'll remember my dick forever" and inquired whether the child "like[s] piss."  The defendant stated "we'll get by with just fucking then!  I can't wait to put that little clit on my tongue…She's going to need to take my whole cock tho man."  The defendant stated, "God I feel nervous Im terrified. How do I know this is for real?? Im almost there."

20. The defendant parked a block away from the original meet agreement and asked the UC to meet him at his vehicle. The defendant provided specific details about where he was parked and stated that he meant to park closer to the meet location. The defendant and the UC went back and forth via KIK whether the UC would come to the car or the defendant would come to the UC's location on the block outside the car, approximately one block away. After the defendant provided the specific details and a photograph of the location he was in one block from the UC's location (the planned meet location), the defendant, still in his car, was blocked in by an unmarked police cruiser with police lights. Agents approached the defendant and identified themselves, and asked the defendant to open his car door. The defendant appeared shocked and was observed fumbling with his phone. The defendant did not comply opening the door, so agents opened it through an open window and placed the defendant under arrest. The defendant's phone was seized on the scene. The defendant produced a New Jersey Driver's License bearing his name, Jordan Adler.

21. The defendant initially waived his Miranda warnings and provided a brief statement to law enforcement. He acknowledged that he communicated with the UC via KIK messenger and sending the video of child pornography to the UC. The defendant denied knowing the contents of the video. During the interview the defendant asked for a lawyer, and the interview ended.

22. A subpoena return from KIK revealed that an iPhone was registered to the KIK account for user "eagle8310".

23. Because ADLER used the Device to distribute child pornography through KIK messenger and to communicate with the UC, there is probable cause to believe that the Device listed in *Attachment A*, which is capable of storing such information, contains images and videos

of child pornography and/or evidence that ADLER solicited, received, produced, and/or distributed child pornography.

## DEFINITIONS

24. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  c. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

  d. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

  e. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

  f. "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.  *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

h. "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

i. "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

j. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

k. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

l. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

m. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

n. "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves. Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency. Many wired networks base the security of the network on physical access control, trusting all the users on the local network. But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it. A wireless access point is equipment that connects to the modem and broadcasts a signal. It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless

network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

  o. "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

29.     Based on my review of the files of similar FBI investigations and conversations that I have had with other federal agents and law enforcement officers, I know that child pornography is not readily available in retail establishments.  Accordingly, individuals who wish to obtain child pornography usually do so by ordering it from abroad or by discreet contact, including through the use of the Internet, with other individuals who have it available or by accessing web sites containing child pornography.

30.     Collectors of child pornography typically retain their materials and related information for many years.  Most collectors of child pornography seek to increase the size of their collections in a manner similar to collectors of coins, stamps, or rare books.  Many retain these materials, including information regarding sources, for their entire adult lives.  Moreover, individuals who distribute and/or collect child pornography generally prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Additionally, collectors of child pornography rarely destroy correspondence from other collectors or distributors unless their activities are detected by law enforcement or other authorities.

31.     Collectors of child pornography often correspond and/or meet with others to share information and materials, rarely destroy correspondence from other child pornography distributors or collectors, conceal such correspondence and sexually explicit material, and often maintain lists of names, addresses, telephone numbers, and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

32.     Accordingly, information used to support probable cause is less likely to be stale because collectors and traders of child pornography are known to store and retain their collections and correspondence with other collectors and distributors for extended periods of time. The United States Court of Appeals, Second Circuit has noted that, "[w]hen a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes.'" *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (quoting *United States v. Lamb*, 945 F. Supp. 441, 459-60 (N.D.N.Y. 1996) (collecting cases)). In *Irving*, the Second Circuit upheld a search based upon information that was approximately 22 months old, noting that, although the affidavit disclosed that the defendant took care to destroy inappropriate photographs, "there was a fair probability that child pornography would be found…" *Id*. Thus, information used to support probable cause in child pornography cases is often not deemed stale, even if somewhat old, because collectors and traders of child pornography are known to store and retain their collections and correspondence related to their collections for extended periods of time.

33.     Additionally, based on information from other law enforcement officers, I know that persons who collect and distribute child pornography:

      a.      Frequently collect sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides, and/or drawings or other visual media that they use for their own sexual arousal and gratifications.

      b.      May receive sexual gratification, stimulation, and satisfaction from actual physical contact with children and/or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (in person, in photographs, or in other visual media) or from literature describing such activity.

## CONCLUSION

34.      I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

_____
Special Agent Laura R. Calvillo
Federal Bureau of Investigation

Sworn and subscribed before me
this ____ day of January, 2018

_____
Honorable Deborah A. Robinson
United States Magistrate Judge